## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

WILLIAM TODD LEWALLEN,                )
                                      )
                    Petitioner,       )
                                      )
v.                                    )          Case No. 18-CV-0414-CVE-CDL
                                      )
SCOTT CROW,[1]                        )
                                      )
                    Respondent.       )

### OPINION AND ORDER

Petitioner William Todd Lewallen, a state inmate appearing pro se,[2] claims that he is in custody, under the sentence imposed against him in the District Court of Tulsa County, Case No. CF-2012-5174, in violation of the United States Constitution.  Lewallen contends that the sentence, imposed after the Oklahoma Court of Criminal Appeals ("OCCA") vacated his original sentence and remanded the case for resentencing, is unconstitutional because the trial court deprived Lewallen of his right to testify at the new sentencing proceeding.  Having considered Lewallen's 28 U.S.C. § 2254 petition for writ of habeas corpus (Dkt. # 1), respondent Scott Crow's response (Dkt. # 10) in opposition to the petition, the state-court record (Dkt. ## 10, 11, 12, 13), and applicable law, the Court concludes that the petition shall be conditionally granted.

---

[1]     Pursuant to FED. R. CIV. P. 25(d), the Court substitutes Scott Crow, Director of the Oklahoma Department of Corrections ("ODOC"), in place of Joe Allbaugh, the ODOC's former director, as party respondent.  The Clerk of Court shall note this substitution on the record.

[2]     Because Lewallen appears pro se, the Court liberally construes his petition.  Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

*BACKGROUND*

**I.      Original trial and first appeal**

In November 2012, the State of Oklahoma ("the state") filed a felony information, in the District Court of Tulsa County, Case No. CF-2012-5174, charging Lewallen with one count of child neglect, in violation of OKLA. STAT. tit. 21, § 843.5(C), after former conviction of two or more felonies. Dkt. # 11-5, O.R. vol. 1, at 33-36 [28-31].[3]   In an amended information filed in June 2014, the state alleged that on November 11, 2012, Lewallen "willfully or maliciously fail[ed] to provide proper supervision and/or a safe and/or sanitary environment" for his three children, C.L., J.L., and W.L., all of whom were under the age of four years old, "by taking a combination of oxycontin, flexaril and dilantin and by drinking alcohol during the time" he was caring for the children at his home "and as a result W.L was naked and unsupervised outside, C.L. was locked and unsupervised in a dog cage, and J.L. was naked and unsupervised, and the residence was unsanitary with [the children exposed to] feces, dirty diapers, and spoiled food." Dkt. # 11-6, O.R. vol. 2, at 11 [207].[4] The state further alleged that, at the time of the charged offense, Lewallen had previously been convicted of seven felonies. Dkt. # 11-6, O.R. vol. 2, at 13-14 [209-10].

---

[3]      The Court's citations generally refer to the CM/ECF header pagination.  The Court refers to the original record as "O.R. vol. _, at _," and refers to trial transcripts as "Tr. Trial vol. _, at _." For citations to the original record and transcripts of court proceedings, the Court cites to the CM/ECF header page number and, if that page number differs from the original page number, also provides the original page number in brackets.

[4]      The state also charged Lewallen's wife (now, ex-wife), Erin Lewallen, with felony child neglect, alleging that she failed to provide supervision or a safe environment for her children by leaving them with Lewallen.  Dkt. # 11-5, O.R. vol. 1, at 33-36 [28-31].  Erin pleaded guilty in 2013, before Lewallen's original trial, and received a deferred sentence.  Dkt. # 11-5, O.R. vol. 1, at 162-66 [157-61].

Following a trial in November 2014, the jury found Lewallen guilty as charged and recommended a sentence of 23 years' imprisonment. Dkt. # 11-6, O.R. vol. 2, at 27-28 [223-24]. The trial court sentenced Lewallen accordingly, and Lewallen filed an appeal. Dkt. # 10-2, Judgment and Sentence (Dec. 8, 2014), at 1; Dkt. # 10-3, Lewallen v. State, No. F-2014-1063, 2016 OK CR 4 (Okla. Crim. App. 2016) ("OCCA 2016 Op."), at 1.  In a published opinion filed March 11, 2016, the OCCA affirmed Lewallen's conviction but vacated his sentence because the trial court erroneously instructed the jury on the range of punishment[5] during the sentencing phase of Lewallen's bifurcated trial,[6] and remanded the case to the District Court of Tulsa County for resentencing.  Dkt. # 10-3, OCCA 2016 Op., at 2.

## II.     Motion to present new evidence

Following the remand, Lewallen timely requested a new sentencing jury, and the trial court scheduled a new sentencing proceeding for February 6, 2017.[7] Dkt. # 11-6, O.R. vol. 2, at 143 [339]. On January 3, 2017, Lewallen filed a "notice of intent to present evidence," advising the trial court

---

[5]     At the time relevant to Lewallen's offense, a person convicted of child neglect could be sentenced to a prison term not exceeding life.  OKLA. STAT. tit. 21, § 843.5(C).  The OCCA explained that, under Oklahoma's recidivist statute, OKLA. STAT. tit. 21, § 51.1, Lewallen's range of punishment was four years to life imprisonment because he had two or more prior felony convictions, but the jury was incorrectly instructed that the range was 20 years to life imprisonment.  Dkt. # 10-3, OCCA 2016 Op., at 2-5.

[6]     Oklahoma law provides for a bifurcated jury trial in a noncapital case when the state, as it did in Lewallen's case, alleges that the defendant committed an offense after former conviction of one or more felonies.  OKLA. STAT. tit. 22, § 860.1.

[7]     Under Oklahoma law, "[w]hen a criminal case is remanded for vacation of a sentence, the court may: 1. Set the case for a nonjury sentencing proceeding; or 2. If the defendant or the prosecutor so requests in writing, impanel a new sentencing jury."  OKLA. STAT. tit. 22, § 929(B).  "If a written request is filed within twenty (20) days of the date of the appellate court order, the trial court shall impanel a new jury for the purpose of conducting a new sentencing proceeding."  OKLA. STAT. tit. 22, § 929(C).

that he intended to testify and to present other witnesses at the new sentencing proceeding and that he anticipated that the state would object to the presentation of any evidence that was not admitted at the original trial.  Dkt. # 11-6, O.R. vol. 2, at 143 [339].  The trial court construed Lewallen's notice as a motion and held a hearing on January 20, 2017.  Dkt. # 11-1, Tr. Mot. Hr'g, at 1-3.  At the conclusion of the hearing, the trial court took the matter under advisement.  Dkt. # 11-1, Tr. Mot. Hr'g, at 15-18.  The trial court denied Lewallen's motion on February 2, 2017, ruling that only the witnesses who testified at the original trial and the exhibits admitted at the original trial would be permitted at the new sentencing proceeding.  Dkt. # 11-5, O.R. vol. 1, at 29-30 [25-26].[8]

## III.   New sentencing proceeding

Lewallen's new sentencing proceeding commenced on February 7, 2017, and concluded on February 9, 2017.  Dkt. # 11-2, Tr. Trial vol. 1, at 1; Dkt. 11-4, Tr. Trial vol. 3, at 66 [555].  The prosecutor called five witnesses and presented several exhibits.[9]  Dkt. # 11-2, Tr. Trial vol. 1, at 3.  Lewallen presented one exhibit:  a DVD depicting a videotaped forensic interview of his then three-

---

[8]   The trial court's ruling on the motion to present evidence is reflected in an entry on the state court's docket sheet, and the entry indicates that the ruling may have been delivered from the bench during a hearing held on February 2, 2017.  Dkt. # 11-5, O.R. vol. 1, at 29-30 [25-26].  But there is no indication in the state court record that a transcript of that hearing was either prepared or presented to the OCCA when Lewallen filed his second appeal.  Dkt. # 11-7, O.R. vol. 3, at 48-58 [440-450], 62 [454].  The Court therefore relies on the description of the ruling that is provided in the docket entry to explain that ruling here.

[9]   Crow did not provide this Court with transcripts of the original trial.  However, given the trial court's pretrial ruling regarding evidence that would be admitted at the new sentencing proceeding, the Court finds it reasonable to infer that the state recalled some or all witnesses who testified at the original trial and presented exhibits that were properly admitted at the original trial.

year-old son, W.L.  Dkt. # 11-2, Tr. Trial vol. 1, at 4; Dkt. # 11-3, Tr. Trial vol. 2, at 213-14 [464-65].[10]

### A.    The state's evidence

The following facts were presented to the jury at the new sentencing proceeding through the state's evidence.  On November 11, 2012, Lewallen's wife, Erin, went to work around 9:30 or 10:00 a.m., leaving Lewallen to care for their three children, W.L., J.L., and C.L., all of whom were under the age of four.  Dkt. # 11-3, Tr. Trial vol. 2, at 140-41 [391-92], 155 [406].  Lewallen injured his back a few days earlier and had returned home from the hospital on November 10, 2012, against medical advice, because the Lewallens could not afford a babysitter.  Dkt. # 11-3, Tr. Trial vol. 2, at 143-44 [394-95], 155 [406].  Around 3:30 p.m., on November 11, 2012, Lewallen was cleaning the house when his back began hurting.  Dkt. # 11-3, Tr. Trial vol. 2, at 152-53 [403-04].  Lewallen took one Oxycontin, as prescribed for pain, drank some or all of one beer and some soda, and laid down for a nap.  Dkt. # 11-3, Tr. Trial vol. 2, at 160-61 [411-12].  Earlier, throughout that same day, Lewallen had taken three Oxycontin, two Flexeril (a muscle relaxant), and one Dilantin (an anti-seizure medication), all of which had been prescribed to him to treat his back injury or to treat pre-existing medical conditions.  Dkt. # 11-3, Tr. Trial vol. 2, at 151-52 [402-03], 160-61 [411-12].  When Lewallen laid down for a nap, all three children were in the bedroom with Lewallen, and J.L. and C.L. were asleep.  Dkt. # 11-3, Tr. Trial vol. 2, at 153 [404].

Just "before sundown," maybe between 4:00 and 5:00 p.m., a neighbor of the Lewallens, Matthew Testerman, stepped out of the back door of his house and heard "a young child yelling for

---

[10]    The parties stipulated to the admission of the forensic interview both at the original trial and at the new sentencing proceeding.  Dkt. # 11-3, Tr. Trial vol. 2, at 213-14 [464-65]; Dkt. # 11-6, O.R. vol. 2, at 153 [349].

his daddy." Dkt. # 11-3, Tr. Trial vol. 2, at 31-33 [282-84], 37 [288]. It was cold outside, possibly around 45 degrees. Dkt. # 11-3, Tr. Trial vol. 2, at 33 [284], 73 [324]. Testerman walked to his back fence but his view was obstructed so he jumped over the fence, into an alley behind his house. Dkt. # 11-3, Tr. Trial vol. 2, at 34 [285]. In the Lewallens's back yard, Testerman saw a young boy, maybe 3 or 4 years old, who was "stark naked" and "freaking out." Dkt. # 11-3, Tr. Trial vol. 2, at 35-36 [285-86]. The boy, later identified as W.L., was running back and forth between a back door and a side door, trying to get inside. Dkt. # 11-3, Tr. Trial vol. 2, at 35-36 [286-87]. Through the window of the Lewallens's house, Testerman saw a young girl, later identified as W.L.'s sister, C.L. Dkt. # 11-3, Tr. Trial vol. 2, at 35-36 [286-87], 62-63 [313-14]. Testerman saw C.L. running back and forth inside and heard her "screaming for her brother." Dkt. # 11-3, Tr. Trial vol. 2, at 35-36 [286-87], 62-63 [313-14]. Testerman also saw a dog inside the house with C.L.; he thought the dog might be a golden retriever. Dkt. # 11-3, Tr. Trial vol. 2, at 39 [290], 64-65 [315-16]. Testerman encouraged W.L. to walk to the gate on Testerman's fence and told W.L. that he could help him. Dkt. # 11-3, Tr. Trial vol. 2, at 38 [289]. According to Testerman, W.L. appeared "scared" and "cold." Dkt. # 11-3, Tr. Trial vol. 2, at 35 [286]. Testerman, who described W.L.'s lips as "dark purple," wrapped his jacket around W.L. and carried W.L. inside the Testerman's house to get warm. Dkt. # 11-3, Tr. Trial vol. 2, at 37-39 [288-90]. Testerman's wife clothed W.L. and gave him warm milk while Testerman called the police. Dkt. # 11-3, Tr. Trial vol. 2, at 38-39 [289-90]. While he waited for law enforcement officers to arrive, Testerman returned to his back fence and yelled toward the Lewallens's house in an attempt to make contact with a parent. Dkt. # 11-3, Tr. Trial vol. 2, at 38-39 [289-90]. At that time, Testerman realized he did not see C.L. running around any more and that concerned him. Dkt. # 11-3, Tr. Trial vol. 2, at 39 [290].

Approximately 25 minutes later, two law enforcement officers, Officer Daniel Embrey and Captain Karen Tipler arrived at the Lewallens's house. Dkt. # 11-3, Tr. Trial vol. 3, at 40-42 [291-93], 71 [322], 97 [348]. The officers began knocking "loudly" on the front door of the house, but no one answered. Dkt. # 11-3, Tr. Trial vol. 2, at 42 [293], 74-76 [325-27], 101-02 [352-53]. Testerman told Officer Embrey that there was at least one other child in the house and, at some point, Captain Tipler saw, through a window, that C.L. was sitting inside a dog cage. Dkt. # 11-3, Tr. Trial vol. 2, at 42-43 [293-94], 49 [300], 76-77 [327-28], 102 [353]. Captain Tipler testified that she "couldn't believe what [she] was seeing" and that she immediately thought that C.L. "must be trapped in there." Dkt. # 11-3, Tr. Trial vol. 2, at 102 [353]. With Testerman's help, the officers kicked in the back door and entered the Lewallens's house. Dkt. # 11-3, Tr. Trial vol. 2, at 43-44 [294-95], 77-78 [328-29], 103-04 [354-55].

Officer Embrey removed C.L. from the dog cage. Dkt. # 11-3, Tr. Trial vol. 2, at 82 [333]. According to the officers, the cage was "locked" or latched, C.L. was wearing a wet, dirty diaper that appeared to have been unchanged for some time, C.L. was "filthy," and C.L. smelled "awful." Dkt. # 11-3, Tr. Trial vol. 2, at 81-82 [332-33], 104-06 [355-57], 120-21 [371]. Captain Tipler changed C.L.'s diaper, while Testerman and Officer Embrey continued walking through the home looking for an adult. Dkt. # 11-3, Tr. Trial vol. 2, at 106-07 [357-58]. Testerman described the house as "messy," "disgusting," and "nasty" with a "stench [that] was unreal." Dkt. # 11-3, Tr. Trial vol. 2, at 58 [309]. On the floor of the house, Testerman and the officers saw dirty diapers, a cereal bowl, and a rotten pork chop, and they saw "dog feces throughout the house." Dkt. # 11-3, Tr. Trial vol. 2, at 51-52 [302-03], 65-67 [316-18], 83 [334], 107 [358]. According to Testerman, C.L. "was covered in feces" which he described as "[h]er own and the dog's." Dkt. # 11-3, Tr. Trial vol. 2, at

7

46 [297].  Officer Embrey testified he also saw "feces smeared all over" C.L. and "smeared on the walls in the back room."  Dkt. # 11-3, Tr. Trial vol. 2, at 81 [332], 83 [334].  Captain Tipler, who changed C.L.'s diaper, testified that she saw feces on C.L. only on the area of C.L.'s body that was covered by her dirty diaper.  Dkt. # 11-3, Tr. Trial vol. 2, at 106-07 [357-58].  Officer Embrey found a third child, later identified as J.L., naked and sleeping uncovered on the bed with Lewallen, who was sleeping underneath a comforter or blanket.  Dkt. # 11-3, Tr. Trial vol. 3, at 52-53 [303-04], 84-86 [335-37], 108 [359], 123 [374].  Captain Tipler placed a clean diaper on J.L., and J.L. continued sleeping.  Dkt. # 11-3, Tr. Trial vol. 2, at 109 [360].

When the officers were "finally" able to rouse Lewallen from his nap, he appeared "confused" and "groggy."  Dkt. # 11-3, Tr. Trial vol. 2, at 68 [319], 87 [338], 109-10 [360-61], 117-18 [368-69].  Captain Tipler got the impression that Lewallen "didn't know what was going on."  Dkt. # 11-3, Tr. Trial vol. 2, at 127 [378].  The officers placed the Lewallen children in protective custody and  placed Lewallen under arrest.  Dkt. # 11-3, Tr. Trial vol. 2, at 68 [319], 88 [339].

Detective Mark Hodges interviewed Lewallen around 9:30 p.m. on the day of his arrest.  Dkt. # 11-3, Tr. Trial vol. 2, at 129 [380], 135-36 [386-87], 140 [391].  According to Detective Hodges, Lewallen did not appear to be under the influence of drugs or alcohol at the time of the interview.  Dkt. # 11-3, Tr. Trial vol. 2, at 138 [389].  Lewallen told Hodges that he had been awake since 4:30 a.m. that day, told him about the prescription medications he had taken throughout the day, and told him that he drank part of one beer and some soda around the same time he took his fourth Oxycontin, just before he laid down to nap with the children around 4:00 p.m.  Dkt. # 11-3, Tr. Trial vol. 2, at 141-42 [392-93], 145-47 [396-98], 151-53 [402-04].  Lewallen told Hodges that the next thing he remembered was being awakened by law enforcement officers and being told that one of

8

his children had been found outside naked and one had been found locked in a dog crate. Dkt. # 11-3, Tr. Trial vol. 2, at 142 [393], 148-49 [399-400]. Lewallen told Hodges he did not know anything about how the children came to be in those situations, and Hodges believed him. Dkt. # 11-3, Tr. Trial vol. 2, at 142-43 [393-94], 155 [406], 157 [408]. Lewallen told Hodges that he and his family recently moved into the house, that they had not had the dog or the dog crate for very long, that he had previously told the children not to play in the crate, and that J.L. and C.L. were both sleeping when he laid down for a nap. Dkt. # 11-3, Tr. Trial vol. 2, at 142-44 [393-95], 153 [404], 157 [408]. Lewallen also told Hodges about his recent back injury and that he had left the hospital early to care for the children. Dkt. # 11-3, Tr. Trial vol. 2, at 143-44 [394-95].

Dr. Sarah Passmore testified that she reviewed photographs of the Lewallens's home that were taken by the officers who placed the Lewallen children in state custody, that she obtained background information about the case from a social worker, and that she physically examined the Lewallen children. Dkt. # 11-3, Tr. Trial vol. 2, at 161 [412], 167-69 [418-20]. Dr. Passmore found that all three children were healthy and she found no evidence of malnutrition or injuries. Dkt. # 11-3, Tr. Trial vol. 2, at 169-74 [420-25], 178-86 [429-37] 192-96 [443-47]. Dr. Passmore testified that she diagnosed all three with "child neglect," because they were found unsupervised and "without an appropriate caregiver" on November 11, 2012. Dkt. # 11-3, Tr. Trial vol. 2, at 161 [412], 167-74 [418-25], 178-86 [429-37] 192-96 [443-47]. Dr. Passmore explained that a medical diagnosis of "child neglect," in broad terms, means that the child's needs are not being met. Dkt. # 11-3, Tr. Trial vol. 2, at 175 [426]. Dr. Passmore also diagnosed C.L., who was then 22 months old, with a speech delay, opining that "[i]t would be very uncommon for [C.L.] to not speak at that age." Dkt. # 11-3, Tr. Trial vol. 2, at 193 [444]. Dr. Passmore further opined that a person under the influence of pain

medication and alcohol to the point of unconsciousness should not be supervising three children under the age of four.  Dkt. # 11-3, Tr. Trial vol. 2, at 174 [425], 197 [448].

After presenting this evidence, the state introduced documentary evidence establishing that Lewallen had seven prior felony convictions.  Dkt. # 11-3, Tr. Trial vol. 2, at 209-12 [460-63].  That evidence showed that Lewallen previously had been convicted of grand larceny (two counts) and escape from a penal institution (two counts) for offenses committed between 1989 and 1993, convicted of possession of a stolen vehicle and second degree burglary for offenses committed in 2003, and convicted of possession of a precursor that could be used to manufacture a controlled substance for an offense committed in 2011.  Dkt. # 11-4, Tr. Trial vol. 3, at 13-15 [502-04].

## B.    Lewallen's evidence

On behalf of the defense, Lewallen's counsel offered, and the trial court admitted, the DVD depicting W.L.'s videotaped forensic interview.  Dkt. # 11-3, Tr. Trial vol. 2, at 213-14 [464-65]. W.L. told the forensic interviewer that he felt safe with his parents, that he talked to police that time he was naked outside when his mother was at work and his father was sleeping, that his brother J.L. locked him out of the house, and that his sister C.L. liked to be in the dog cage and that "someone didn't put her there."  Dkt. # 13 (Defendant's Exhibit 1).

## C.    Lewallen's offer of proof and the trial court's ruling

Following the playing of the videotaped forensic interview, the trial court excused the jury so that Lewallen's counsel could make an offer of proof regarding Lewallen's request to present evidence that was not presented at the original trial.  Dkt. # 11-3, Tr. Trial vol. 2, at 215-17. Lewallen's counsel stated that, if permitted, he would call two witnesses:  Lewallen and Lewallen's ex-wife, Erin.  Dkt. # 11-3, Tr. Trial vol. 2, at 218 [469], 225 [476].  Before Lewallen's counsel

offered the proposed testimony of these two witnesses, the trial court summarized its pretrial ruling on Lewallen's request to present new evidence. The trial court noted that the language of OKLA. STAT. tit. 22, § 929(C)(1),[11] permits the admission of "additional relevant evidence" at a new sentencing proceeding and further noted that, under Roy v. State, No. F-2007-1060 (Okla. Crim. App. June 22, 2009) ("Roy II") (unpublished),[12] and Malone v. State, 58 P.3d 208 (Okla. Crim. App. 2002), "the [d]efense may not present mitigation evidence in a non-capitol [sic] case." Dkt. # 11-3, Tr. Trial vol. 2, at 218-19 [469-70]. The trial court also noted that neither Lewallen nor Erin testified at the original trial. Dkt. # 11-3, Tr. Trial vol. 2, at 218 [469], 225 [476].

Lewallen's counsel proffered that Erin would testify about the Lewallens's financial difficulties and their move to a new house shortly before Lewallen's arrest; about Lewallen's medical conditions, including his then-recent back injury, and his use of prescription medications both before and on the day of his arrest; about her opinion that Lewallen was an alcoholic but not a drug addict; about how the conditions in the home at the time of Lewallen's arrest resulted from the family's recent move, Erin's lack of time and energy to clean while Lewallen was in the hospital, and Lewallen's inability to clean following his release from the hospital; and about her discovery that some of the alleged "feces" smears the law enforcement officers reported finding in the house were actually peanut butter smears. Dkt. # 11-3, Tr. Trial vol. 2, at 219-24 [470-75]. The trial court ruled

---

[11]     OKLA. STAT. tit. 22, § 929(C)(1) provides: "All exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding. Additional relevant evidence may be admitted including testimony of witnesses who testified at the previous trial."

[12]     Crow submitted a copy of the unpublished Roy II decision as part of the appellate brief Lewallen filed in the OCCA. See Dkt. # 10-4, Appellant's Br., at 17-35. The Court will therefore cite to the Roy II decision as follows, Dkt. # 10-4, Roy II, at ___, using the CM/ECF pagination.

that "a large portion" of Erin's proffered testimony "bears directly on guilt or innocence and that has

already been determined," and that "the bulk of the remainder [w]as mitigation evidence with regard

to the punishment phase." Dkt. # 11-3, Tr. Trial vol. 2, at 224 [475]. The trial court therefore

affirmed its prior ruling excluding Erin's proffered testimony.

Next, Lewallen's counsel proffered that, if permitted, Lewallen would testify as follows:

[Lewallen] would state that he's 52 years old. And in 2012 he had three young children with his then wife, Erin. He hasn't seen his children since November 11th, 2012, the night of his arrest. He has since surrendered his parental rights.

Mr. Lewallen suffers from COPD, or Chronic Obstructive Pulmonary Disease, which is a terminal illness. Primarily this means he has trouble breathing. Sometimes he has to rest and he cannot catch his breath and he has to use oxygen at times.

He's had trouble breathing since his time as a roughneck when he received what he calls caustic burns that left him partially disabled. He also suffers from hypothyroidism, emphysema, and back problems.

When he was on his feet at the time in November of 2012, he would use a back brace. Sometimes he would even use a walker. He's had these issues -- or he had these issues in November of 2012. This adversely affected the length of time that he would perform labor as well as his ability to lift anything heavy. William Lewallen was unable to work.

He would testify substantially in accordance with [Erin's] testimony with regard to how they acquired the house, what happened when they moved into the house.[13]

He would testify that about three days into the time that they lived in the house, this would have been November 8th, 2012, he tripped over the family dog and injured his back. He could barely move. And Erin took him to St. Francis Hospital where he was admitted.

During his stay he was diagnosed with a lumbar spine injury, but the injury did not require immediate surgical intervention, and Mr. Lewallen was released during the early afternoon on Saturday November 10th, 2012.

He does recall that the house wasn't in very good shape at the time. In particular, he remembers the diapers overflowing the waste can in the bathroom.

---

[13]   Erin would have testified that her mother had recently purchased a house and had agreed to let the Lewallens rent the house "with the understanding that they would fix the place up." Dkt. # 11-3, Tr. Trial vol. 2, at 219-20 [470-71]. She would have further testified that she and Lewallen, along with the three children, moved into the house about a week before Lewallen's arrest. Dkt. # 11-3, Tr. Trial vol. 2, at 220 [471].

Erin had been on her own for three days while William was in the hospital, and at the time he simply didn't feel up to cleaning the house.

Mr. Lewallen would testify that while he believed he was able to take care of the kids at the time, he truly was not in any shape to do so.

He had a prescription for pain [medication] that he had never used before. It was actually called Oxycodone and the thought that it would help. He was on a number of other prescriptions at the time relating to his breathing troubles and took a nebulizer treatment three times a day to help his breathing.

He took Dilantin for seizures, Neurontin, used Ativan inhalers, and used oxygen when necessary to help him breathe.

Mr. Lewallen remembers going to bed early on Saturday night because he didn't feel well. He started taking the Oxycodone as prescribed, which was one tablet every four hours. He woke up early in the morning on November 11th. Erin made cereal and William Lewallen cleaned up the dishes.

He thinks he might have taken one of the bowls of cereal that still had milk in it and put it on the floor for the dog, which was still there when the police arrived later that day.

Erin went to work in the morning. She was working at Wal-Mart at the time. William remembers her telling him that, I'm counting on you today. She knew that he didn't feel well.

William took a pain pill after he woke up that morning and also took a Dilantin. William Lewallen remembers reading to [J.L.] for a while. He liked reading Thomas the Tank Engine. The other children played with their toys.

He did change diapers that day. He changed more than one in the morning and put the dirty diapers in a box in the kitchen. He did not just throw them on the floor.

William Lewallen doesn't remember an unusually bad smell in the house, although he was aware that there was some standing water under the house.

When they were moving in, the Lewallens contacted a pest control company to check out for bugs or other pests. There were not any.

The man who did the check told Mr. Lewallen that there was standing water under the house and it was probably the result of a sewage backup or pipe issue. William Lewallen had not had the time or the money to get to it.

Also the furnace was broken and the family had to rely on space heaters. There was no air circulation in the house and that made it stuffy.

Around lunchtime William Lewallen took another pain pill, fed the children lunch, which included a peanut butter sandwich. Played with the children.

He noticed that in [W.L.'s] bedroom the tack strip was exposed and he tried to cover it up with some carpet that had been laid in the house that week.

He quickly became tired and everyone laid down to watch some television. All three kids had clothing on at the time and William Lewallen checked their diapers during this period. He did take another pain pill as prescribed and drank a small portion of a beer. He fell asleep and he thought the kids did as well.

13

He woke up to find the police in his house. He was very confused. He had never used Oxycodone before, although he had taken other pain pills in the past such as Lortab. This had never happened before and he thinks that there might have been a stronger effect from the drug. He estimates that he had been asleep for several hours.

Mr. Lewallen denies locking his daughter up in a dog cage. They had just gotten the cage and the dog. It was new to the kids [and] they tried to play in the cage all the time. They were not permitted to do so.

The two older children knew how to unlock doors and William, alone, believes that either [J.L.] locked [W.L.] out or [W.L.] locked himself out. William Lewallen was negligent in the care, but he did not deliberately lock his son out of the house or lock his daughter up in a cage.

Dkt. # 11-3, Tr. Trial vol. 2, 225-30 [476-81] (footnote and alterations added).

After hearing Lewallen's proposed testimony, the trial court again acknowledged that OKLA.

STAT. tit. 22, § 929(C)(1) "provides that additional relevant evidence may be admitted" at a new

sentencing proceeding and asked trial counsel to explain how Lewallen's testimony was relevant.

Dkt. # 11-3, Tr. Trial vol. 2, at 230 [481]. The following colloquy then occurred between the trial

court and counsel:

[Counsel]: Your Honor, under the Malone decision -- I remember Malone well. I was involved in the appeal. The underpinnings of Malone were, as the Court has pointed out, that the Defense wanted to offer mitigation.

I believe that Malone was somewhat of a compromise. There were, as I recall, some -- I think there was maybe an absolute dissent, some concurring in the result opinions, where essentially I think they adopted the position of Judge Lumpkin.

Judge Lumpkin stated that, while simple mitigation and simple aggravation would not be admissible, that in the telling of their story and presenting a defense, as the State presents its case in chief, certainly [s]ome aggravation and mitigation would work its way in. And that way --

[The Court]: Because a lot of what I heard goes to guilt or innocence.

[Counsel]: Correct. Correct. As did the State's case in chief. There is a certain difficulty, if you will, with the system that we have in Oklahoma with jury sentencing because of what we had to do in this case. The State had to present its case again, the State did present its case again, and incorporated within that case was both evidence

14

relating to guilt and innocence which arguably wouldn't have been admissible logically because the jury had already determined that.

[The Court]: Under both <u>Roy [II]</u> and <u>Malone</u> that's permitted.  Correct?

[Counsel]: Right.  It's the only way to do it.

[The Court]: Right.

[Counsel]: By denying the defendant the right to present anything, I believe that he has been denied his right to a fair sentencing proceeding.

[The Court]: Well, he presented some evidence to the jury.  He hasn't been flat out denied the opportunity to present anything --

[Counsel]: Correct.

[The Court]:  -- as you say.

[Counsel]:  He most certainly was denied the opportunity to testify in his own defense, at the very least.

[The Court]: Yes.

[Counsel]: So in response to your question as to relevance, I believe that, yes, there is some discussion with regard to guilt or innocence.  But implicit in that is evidence which would allow the jury to weigh the strength of the State's case.

[The Court]: Mitigation.

[Counsel]: When I briefed this issue, the case law didn't necessarily define it as that. They just simply said that when determining a sentence without hearing specifically mitigating or aggravating evidence in determining an appropriate sentence, they would weigh the strength of the State's case.  Which is something that they have to do whether the defendant presents any evidence or not.

     Unfortunately, when the defendant does not present any evidence, I think that sort of tilts the scales against him.

[The Court]: But he did present some evidence today.  You're saying any.  But he did, in fact, present evidence to the jury today.

[Counsel]: He did by stipulation.

15

And I think the reason for that was because this court was -- it was important for this court to not go beyond the parameters of the original trial.   And that was certainly what the -- what the State wanted to do.  And in presenting Defendant's Exhibit 1, we were falling within those parameters.

[The Court]:  And the statute provides that I may admit additional relevant evidence. And I found no additional relevant evidence --

[Counsel]:  I understand.

[The Court]:  -- and used my discretion in that manner.

Dkt. # 11-3, Tr. Trial vol. 2, at 231-34 [482-85].  Following this colloquy, the trial court asked the prosecutor for a response, and the prosecutor maintained his position "that this new information or new evidence is barred, in the State's mind, based on [OKLA. STAT. tit. 22, § 929] . . . [a]nd also under the Roy [II] decision."  Dkt. # 11-3, Tr. Trial vol. 2, at 234 [485].  Because the trial court excluded Lewallen's proffered testimony, Lewallen did not testify at the new sentencing proceeding.

**D.**     **The jury's verdict**

During closing arguments, the prosecutor argued that the state's evidence regarding the circumstances of the offense combined with Lewallen's criminal history justified a sentence of 25 years' imprisonment.  Dkt. # 11-4, Tr. Trial vol. 3, at 21-31 [516-19], 48-49 [537-38].  Defense counsel argued that the circumstances of this case were less severe than many cases involving child neglect and urged the jury to impose a prison term of less than 10 years.  Dkt. # 11-4, Tr. Trial vol. 3, 45-46 [534-35].  Following deliberations, the jury returned a verdict finding Lewallen "guilty of the crime of child neglect after two or more previous convictions and affix[ed] punishment at 14 years."  Dkt. # 11-4, Tr. Trial vol. 3, at 57 [546].  Lewallen waived his statutory right to delay his sentencing, and the trial court sentenced Lewallen to 14 years' imprisonment, with credit for all time

served and earned, to be followed by a one-year term of post-imprisonment supervision.  Dkt. # 11-4, Tr. Trial vol. 3, at 59-60 [548-49]; Dkt. # 11-7, O.R. vol. 3, at 36.

## IV.    Second appeal

Represented by appellate counsel, Lewallen filed an appeal in the OCCA to challenge his new sentence.  Lewallen claimed that "[t]he trial court erred when it denied [Lewallen] the right to testify in his defense at the resentencing trial."  Dkt. # 10-4, Appellant's Br., at 13.[14]  He argued that the trial court violated his constitutional right to testify, as that right is interpreted in Rock v. Arkansas, 483 U.S. 44 (1987), by excluding his proffered testimony as "not relevant," and further argued that the error was "structural" and thus required automatic reversal for a new sentencing proceeding.  Dkt. # 10-4, Appellant's Br., at 12-16.

In an unpublished opinion filed May 24, 2018, the OCCA affirmed Lewallen's sentence. Dkt. # 10-7, Lewallen v. State, No. F-2017-189 (Okla. Crim. App. 2018) ("OCCA 2018 Op."), at 2, 7.  The OCCA first rejected Lewallen's argument that the alleged denial of his right to testify would be a structural error, reasoning that the United States Supreme Court ("Supreme Court") has not held that the denial of a defendant's right to testify is one of the few constitutional errors that infects the entire criminal proceeding and thus requires reversal without a showing of prejudice. Dkt. # 10-7, OCCA 2018 Op., at 2-3 & n.2.  The OCCA then rejected Lewallen's argument that the trial court violated his right to testify by excluding his proffered testimony.  Applying Rock, the OCCA acknowledged that Lewallen had a fundamental, but not absolute, right to testify.  Dkt. # 10-7, OCCA 2018 Op., at 3-4.  The OCCA recognized that "[i]n applying its evidentiary rules a State

---

[14]     Lewallen did not challenge the trial court's exclusion of Erin's proffered testimony when he appealed his new sentence.  Dkt. # 10-4, Appellant's Br., at 12-16.  Nor does he attempt to do so in this habeas proceeding.  Dkt. # 1, Pet., at 4-7.

must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." Dkt. # 10-7, OCCA 2018 Op., at 5 (quoting Rock, 483 U.S. at 56). The OCCA then stated,

> This Court has cautioned that 'resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt." Rojem v. State, 2006 OK CR 7, ¶ 56, 130 P.3d 287, 299. Resentencing proceedings are unique; the original jurors who heard evidence relating to guilt/innocence are gone and have been replaced with jurors who are not familiar with that evidence. Rojem, 2006 OK CR 7, ¶ 53, 130 P.3d at 298. The resentencing jurors are told that the defendant has already been found guilty and they are only asked to assess punishment. While this Court has specifically held that a defendant has no right to present mitigating evidence in the sentencing phase of a non-capital case, see Malone v. State, 2002 OK CR 34, ¶¶ 5-7, 58 P.3d 208, 209-10, we do not ask the jurors to assess punishment without the benefit of knowing the acts they are punishing. See Rojem, 2006 OK CR 7, ¶ 55, 130 P.3d at 299 (jurors in a resentencing proceeding will always be able to consider the weight of the evidence in deciding punishment). Accordingly, relevant evidence properly admitted in the prior trial is admissible in the resentencing trial. Title 22 O.S. 2011, § 929(C)(1) specifically addresses the introduction of evidence in a non-capital case remanded for a new sentencing proceeding before a jury providing [sic] and states:

> > All exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding. Additional relevant evidence may be admitted including testimony of witnesses who testified at the previous trial.

> The evidence of Lewallen's medical condition and his consumption of prescribed medication as well as its effect on his ability to clean his house and care for his children was introduced in his original trial and was introduced through the testimony of State's witnesses at the resentencing trial. This evidence was relevant to show Lewallen's resentencing jury the facts upon which his conviction was based and to allow them to make an informed decision regarding the assessment of his sentence. The evidentiary restrictions relied upon by the trial court in its decision to disallow Lewallen's proffered testimony at the resentencing trial, however, were neither arbitrary nor disproportionate to the purposes they were designed to serve. Lewallen was not precluded from testifying at his resentencing trial because he had not testified at the original trial. Rather, the trial court ruled against his request because his proffered testimony went to guilt or innocence and its mitigation value was not relevant to sentencing. The trial court denied Lewallen's request based upon

18

the most basic rule of admissibility, i.e., the rule of relevancy.  12 O.S. 2011, § 2402.
The trial court's ruling did not deny Lewallen the right to present a defense; it
excluded the admission of irrelevant evidence.  There was no structural error, no
constitutional error, and no abuse of discretion by the trial court in excluding this
evidence.  Relief is not required.

Dkt. # 10-7, OCCA 2018 Op., at 5-7.

## V.     Petition for writ of habeas corpus

Proceeding pro se, Lewallen filed the instant petition for writ of habeas corpus on August 10,

2018.  Dkt. # 1, Pet., at 1.  Crow filed a response (Dkt. # 10), urging the Court to deny the petition,

and provided state court records (Dkt. ## 10, 11, 12, 13) necessary for this Court to adjudicate

Lewallen's claim.

## *DISCUSSION*

Lewallen seeks federal habeas relief on the same claim that he presented to the OCCA

through his second appeal.  He contends that he "was denied his fundamental right to testify in his

own behalf during a jury sentencing trial in violation of the 5th, 6th, and 14th Amendments to the

United States Constitution" because the trial court excluded his proffered testimony as not relevant

to  the new sentencing proceeding.  Dkt. # 1, Pet., at 4-5.  Lewallen further contends, as he did in

state court, that this constitutional error was a structural error that required automatic reversal.  Dkt.

# 1, Pet., at 5-6.

Crow contends that Lewallen did not exhaust available state remedies as to a portion of his

claim, but Crow asserts that exhaustion is not necessary because that portion of the claim can be

denied on the merits.  Dkt. # 10, Resp., at 2-3.  As to those portions of the claim that Crow identifies

as properly exhausted, Crow contends that 28 U.S.C. § 2254(d) bars relief.  Dkt. # 10, Resp., at 7-16.

19

Alternatively, Crow contends that even if this Court finds that the alleged constitutional error occurred, the petition should be denied because the error was harmless.  Dkt. # 10, Resp., at 16-17.

## I.   Exhaustion and cognizability

### A.   Lewallen properly exhausted all portions of his constitutional claim.

Crow contends that Lewallen did not exhaust available state remedies as to that portion of his claim challenging "the trial court's determination that his proffered testimony was irrelevant." Dkt. # 10, Resp., at 2 & n.3.  Crow acknowledges that "the OCCA expressed its agreement with the trial court's evidentiary ruling on relevance" when the OCCA found that the trial court "excluded the admission of irrelevant evidence," but Crow suggests that the OCCA only "implicitly found the evidence irrelevant."  Dkt. # 10, Resp., at 2-3 nn. 3-4.  Thus, in Crow's view, Lewallen's "argument that his proffered testimony was relevant was not denied on the merits."  Dkt. # 10, Resp., at 3 n.4.

When a petitioner attacks the validity of a state-court judgment by filing a federal habeas petition, the petitioner must show that he or she first exhausted available state remedies by fairly presenting his or her federal claim or claims in state court utilizing the state's established procedures for appellate and postconviction review.  28 U.S.C. § 2254(b); O'Sullivan v. Boerckel, 526 U.S. 838, 842, 845 (1999).

This Court has carefully reviewed the trial court's ruling, the OCCA's decision, and the appellate briefs that were filed in the OCCA and the Court finds no support for Crow's position on exhaustion.  As previously discussed, the sole basis for the trial court's exclusion of Lewallen's proffered testimony was the trial court's determination that the proffered testimony was not relevant. Lewallen squarely presented the relevancy issue to the OCCA when he argued that the trial court's ruling excluding his proffered testimony deprived him of his right to testify.  And the OCCA

20

explicitly addressed the relevancy issue when it determined that the trial court did not abuse its discretion or violate the Constitution because the trial court's ruling merely barred "the admission of irrelevant evidence." Dkt. # 10-7, OCCA 2018 Op., at 5-7. Thus, contrary to Crow's argument, Lewallen's claim that he was denied his right to testify when the trial court excluded his proffered testimony as not relevant to any issues presented at the new sentencing proceeding is fully exhausted.

### B. Lewallen presents a federal claim that is cognizable on habeas review.

Crow further contends that, notwithstanding the alleged failure to exhaust available state court remedies as to this portion of Lewallen's claim, Lewallen's challenge to the trial court's relevancy determination can be denied on the merits because it alleges only an error of state law which is not cognizable on habeas review. Dkt. # 10, Resp., at 2-3, 13-16.

It is true that "[r]un-of-the-mill state law errors usually do not provide a basis for federal habeas relief because a habeas petitioner may obtain relief only if a state court rendered a decision 'in violation of the Constitution or laws or treaties of the United States.'" Fieldman v Brannon, 969 F.3d 792, 800 (7th Cir. 2020) (quoting 28 U.S.C. § 2254(a)); see also, Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999) ("Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights.").

But Crow's argument on this point fails for the same reason as his partial-exhaustion argument. As it was presented to the OCCA and as it is presented in this habeas proceeding, Lewallen's claim does not merely challenge the trial court's relevancy determination as a violation of state evidentiary rules. The trial court's evidentiary ruling that excluded his proffered testimony as not relevant to the new sentencing proceeding forms the foundation of Lewallen's claim that he was deprived him of his constitutional right to testify. And the OCCA addressed Lewallen's claim

as a federal constitutional claim when it applied <u>Rock</u> to reject it.  Contrary to Crow's position, this is not one of those cases where a state prisoner challenges a trial court's evidentiary ruling in state court as a violation of state law and then attempts to convert the alleged state-law error into a cognizable habeas claim by alleging a due process violation in his federal habeas petition.  Rather, Lewallen presented a federal claim in state court and he now presents that same federal claim in this habeas proceeding by alleging that the trial court's evidentiary ruling violated his constitutional right to testify.

## II.     Analysis

### A.     Section 2254(d) guides this Court's review of the federal claim.

Because Lewallen presented his constitutional claim to the OCCA and the OCCA rejected it on the merits, 28 U.S.C. § 2254(d) imposes preconditions to obtaining habeas relief.  <u>See</u> <u>Shinn v. Kayer</u>, 141 S. Ct. 517, 520 (2020) ("The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricts the power of federal courts to grant writs of habeas corpus based on claims that were 'adjudicated on the merits' by a state court.").  Under § 2254(d), a federal habeas court "shall not" grant a petition for writ of habeas corpus filed by a person in custody pursuant to a state-court judgment unless the petitioner first demonstrates that the state court's adjudication of the federal claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[15]

Satisfying the preconditions imposed by § 2254(d) is no easy task. "When a state court has applied clearly established federal law to reasonably determined facts in the process of adjudicating a claim on the merits, a federal habeas court may not disturb the state court's decision unless its error lies 'beyond any possibility for fairminded disagreement.'" Shinn, 141 S. Ct. at 520 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). But, while § 2254(d) sets a high bar, it "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102; see also Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (discussing the deference required by § 2254(d) when a state court has adjudicated the merits of a federal claim and stating, "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

If a petitioner demonstrates that § 2254(d) does not bar relief, a federal habeas court will review the petitioner's federal claim de novo. See Milton v. Miller, 744 F.3d 660, 670-71 (10th Cir. 2014) (noting that overcoming § 2254(d)'s relitigation bar "effectively removes AEDPA's prohibition on the issuance of a writ" and "requires [the federal habeas court] to review de novo" the petitioner's federal claims, without deference to the state court's decision). And, if the federal habeas court finds a constitutional error on de novo review, it "must assess the prejudicial impact of [the] constitutional error . . . under the 'substantial and injurious effect' standard set forth in

---

[15]     As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (quoting Terry Williams v. Taylor, 529 U.S. 362, 412 (2000)).

Brecht [v. Abrahamson, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California], 386 U.S. 18 [(1967)]." Fry v. Pliler, 551 U.S. 112, 121-22 (2007).  Under the Brecht standard, "an error is harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." Fry, 551 U.S. at 116 (quoting Brecht, 507 U.S. at 631).  And a federal habeas court should grant habeas relief if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights." O'Neal v. McAninch, 513 U.S. 432, 445 (1995).

### B.  The OCCA did not unreasonably determine the facts.

A petitioner can avoid § 2254(d)'s bar to habeas relief by showing that the state court's decision rests on an unreasonable determination of the facts presented in state court proceedings. 28 U.S.C. § 2254(d)(2).  "A state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (alterations in original) (quoting Byrd v. Workman, 645 F.3d 1159, 1170-72 (10th Cir. 2011)).  Here, in adjudicating Lewallen's federal claim, the OCCA acknowledged that the material facts were clear and undisputed:  (1) Lewallen did not testify at his original trial, (2) Lewallen asserted his right to testify before and during the new sentencing proceeding, (3) the trial court denied Lewallen's request to testify before and during the new sentencing proceeding, (4) the trial court excluded Lewallen's proffered testimony because the trial court found that the testimony "went to guilt or innocence and its mitigation value was not relevant to sentencing," and (5) Lewallen did not testify at the new sentencing proceeding. Dkt. # 10-7,

OCCA 2018 Op., at 2, 7.  The Court therefore agrees with Crow that the OCCA's decision is not based an unreasonable determination of the facts in light of the state court proceeding.

### C.     Rock v. Arkansas **is clearly established federal law for purposes of § 2254(d)(1).**

When § 2254(d)(1)'s framework applies, a federal habeas court's first task is to identify the clearly established federal law, if any, that governs the petitioner's claim.  House v. Hatch, 527 F.3d 1010, 1015 (10th Cir. 2008).  As he did in state court, Lewallen primarily relies on Rock v. Arkansas, 483 U.S. 44 (1987), to support his claim of constitutional error.  The Court agrees that this is the clearly established federal law governing his claim.  In Rock, the Supreme Court stated over three decades ago that, "[a]t this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  483 U.S. at 49.  The Rock Court found that a defendant's right to testify is guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Rock, 483 U.S. at 51-52.  And the Rock Court described the right to testify as "one of the rights that '[is] essential to due process of law in a fair adversary process.'" Id. at 51 (alteration added) (quoting Faretta v. California, 422 U.S. 806, 819, n. 15  (1975)).

But the Rock Court also recognized that a defendant's right to testify, like a defendant's right to present a complete defense, is not absolute.  Rock, 483 U.S. at 53-56.  In cases involving the right to present a defense, the Supreme Court has explained that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from trials," United States v. Scheffer, 523 U.S. 303, 308 (1998), but this latitude also "has limits," Holmes v. South Carolina, 547 U.S. 319, 324 (2006).  In Rock, the Supreme Court explained that a defendant's right to testify "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial

25

process." Rock, 483 U.S. at 55-56.  Nevertheless, the Rock Court held that a state's evidentiary rules

that place "restrictions on a defendant's right to testify may not be arbitrary or disproportionate to

the purposes they are designed to serve."  Id. at 55-56.  And "[i]n applying its evidentiary rules a

State must evaluate whether the interests served by a rule justify the limitation imposed on the

defendant's constitutional right to testify."  Id. at 56.

After establishing this evaluation method, the Supreme Court applied it to consider the

defendant's argument in Rock that application of Arkansas's per se rule barring hypnotically-

refreshed testimony impermissibly infringed on her right to testify.  Rock, 483 U.S. at 45, 48-49.

The defendant in Rock was charged with manslaughter after shooting her husband and the defendant

underwent hypnosis before trial because she could not recall the details of the shooting.  Id. at 46.

The trial court granted the state's pretrial motion to exclude all of the defendant's hypnotically-

refreshed testimony.  Id. at 47.  The defendant was permitted to testify at trial, but her testimony was

limited to only those facts that she remembered before she was placed under hypnosis.  Id. at 47-48.

The Rock Court held that the "per se rule excluding all posthypnosis testimony infringes

impermissibly on the right of a defendant to testify on his own behalf."  Rock, 483 U.S. at 62.  The

Rock Court reasoned, in part, that "[t]he Arkansas rule enunciated by the state courts does not allow

a trial court to consider whether posthypnosis testimony may be admissible in a particular case; it

is a per se rule prohibiting the admission at trial of any defendant's hypnotically refreshed testimony

on the ground that such testimony is always unreliable."  Id. at 56.  The Rock Court further reasoned

that the application of this per se rule in the defendant's case "had a significant adverse effect on

[her] ability to testify" because it "virtually prevented her from describing any of the events that

occurred on the day of the shooting, despite corroboration of many of those events by other

witnesses," and barred the defendant from "describ[ing] the actual shooting except in the words contained in [the doctor's] notes." Rock, 483 U.S. at 57.

The Rock Court acknowledged that Arkansas was not the only state that had adopted a rule excluding hypnotically-refreshed testimony as unreliable. Rock, 483 U.S. at 57. But the Rock Court noted that other states had adopted that rule "for the testimony of *witnesses*, not for the testimony of a *defendant*." Id. (emphases in original); see also id. at 58 n.15 (noting that "while the California court adopted a far stricter general rule—barring entirely testimony by any witness who has been hypnotized—it explicitly excepted testimony by an accused . . . 'to avoid impairing the fundamental right of an accused to testify in his own behalf'" (quoting People v. Shirley, 31 Cal.3d 18, 67 (1982))). In emphasizing the distinction between a rule that excludes testimony presented through any witness and a rule that excludes the defendant's own testimony, the Rock Court noted that "the most important witness for the defense in many criminal cases is the defendant himself." Rock, 483 U.S. at 52. The Supreme Court thus determined that in applying the per se rule to exclude the defendant's hypnotically-refreshed testimony, "[t]he Arkansas Supreme Court failed to perform the constitutional analysis that is necessary when a defendant's right to testify is at stake." Id. at 57-58. After discussing various views on the admissibility of hypnotically-refreshed testimony, the Rock Court stated,

> We are not now prepared to endorse without qualifications the use of hypnosis as an investigative tool; scientific understanding of the phenomenon and of the means to control the effects of hypnosis is still in its infancy. Arkansas, however, has not justified the exclusion of all of a defendant's testimony that the defendant is unable to prove to be the product of prehypnosis memory. A State's legitimate interest in barring unreliable evidence does not extend to per se exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections. The

27

> State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified.  But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial.

Rock, 483 U.S. at 61.

### D.    The OCCA's decision either is contrary to, or involves an unreasonable application of, Rock.

A petitioner may avoid § 2254(d)'s relitigation bar by showing that the state court's decision either is contrary to, or involves an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  "A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the Court on a 'set of materially indistinguishable facts.'"  Wood, 907 F.3d at 1289 (quoting Terry Williams, 529 U.S. at 412-13).  Thus, " run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)'s 'contrary to' clause."  Terry Williams, 529 U.S. at 406.  A state-court decision "unreasonably applies federal law if it 'identifies the correct governing legal principle' from the relevant Supreme Court decisions, but applies those principles in an objectively unreasonable manner," under the particular facts of the case.  Wood, 907 F.3d 1289 (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)).  But "an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  Terry Williams, 529 U.S. at 410 (emphases in original).  As a result, a habeas court cannot grant relief on a federal claim unless it is convinced that "the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409;

28

see also Milton, 744 F.3d at 668 ("'When reviewing a state court's application of federal law' under 28 U.S.C. § 2254(d), 'we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly.'" (quoting McLuckie v. Abbot, 337 F.3d 1193, 1197 (10th Cir. 2003))).

Here, the OCCA identified Rock as the clearly established law governing Lewallen's claim. Moreover, the OCCA recognized the fundamental nature of Lewallen's right to testify and correctly described Rock's evaluation method which requires the state "to evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." Dkt. # 10-7, OCCA 2018 Op., at 4-5 (quoting Rock, 483 U.S. at 56).[16] Under these circumstances, a state court's decision ordinarily would not be considered contrary to clearly established federal law. But a careful application of Rock's analysis to the facts of this case shows that the OCCA's decision either is contrary to or, at the very least, involves an unreasonable application of Rock.

As previously discussed, a defendant's right to testify "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Rock, 483 U.S. at 55-56. But a state's evidentiary rules that place "restrictions on a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." Id. at 55-56. And "[i]n applying its

---

[16]    The Court recognizes that Lewallen waived his right to testify at the original trial. But the OCCA did not suggest that the prior waiver barred Lewallen from testifying at the new sentencing proceeding. In fact, the OCCA stated that "Lewallen was not precluded from testifying at his resentencing trial because he had not testified at the original trial" and reasoned instead that "[t]he trial court denied Lewallen's request based upon the most basic rule of admissibility, i.e., the rule of relevancy." Dkt. # 10-7, OCCA 2018 Op., at 7. Moreover, in this proceeding, Crow does not argue that the prior waiver barred Lewallen from testifying at the new sentencing proceeding. Dkt. # 10, Resp., generally.

evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." Rock, 483 U.S. at 56.

After identifying Rock's method for evaluating whether a state court's application of evidentiary rules has impermissibly infringed on defendant's right to testify, the OCCA ostensibly applied that method to the facts of this case. Although that part of the OCCA's decision applying Rock's analysis is set forth in the background section of this opinion and order, see supra background section IV, at 18-19, the Court finds it necessary to repeat it here to avoid any misinterpretation or misrepresentation of the OCCA's decision. In determining that no constitutional violation occurred when the trial court denied Lewallen's request to testify, the OCCA stated:

> This Court has cautioned that 'resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt." Rojem v. State, 2006 OK CR 7, ¶ 56, 130 P.3d 287, 299. Resentencing proceedings are unique; the original jurors who heard evidence relating to guilt/innocence are gone and have been replaced with jurors who are not familiar with that evidence. Rojem, 2006 OK CR 7, ¶ 53, 130 P.3d at 298. The resentencing jurors are told that the defendant has already been found guilty and they are only asked to assess punishment. While this Court has specifically held that a defendant has no right to present mitigating evidence in the sentencing phase of a non-capital case, see Malone v. State, 2002 OK CR 34, ¶¶ 5-7, 58 P.3d 208, 209-10, we do not ask the jurors to assess punishment without the benefit of knowing the acts they are punishing. See Rojem, 2006 OK CR 7, ¶ 55, 130 P.3d at 299 (jurors in a resentencing proceeding will always be able to consider the weight of the evidence in deciding punishment). Accordingly, relevant evidence properly admitted in the prior trial is admissible in the resentencing trial. Title 22 O.S. 2011, § 929(C)(1) specifically addresses the introduction of evidence in a non-capital case remanded for a new sentencing proceeding before a jury providing [sic] and states:
>
> > All exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding. Additional relevant evidence may be admitted including testimony of witnesses who testified at the previous trial.

The evidence of Lewallen's medical condition and his consumption of prescribed medication as well as its effect on his ability to clean his house and care for his children was introduced in his original trial and was introduced through the testimony of State's witnesses at the resentencing trial. This evidence was relevant to show Lewallen's resentencing jury the facts upon which his conviction was based and to allow them to make an informed decision regarding the assessment of his sentence. The evidentiary restrictions relied upon by the trial court in its decision to disallow Lewallen's proffered testimony at the resentencing trial, however, were neither arbitrary nor disproportionate to the purposes they were designed to serve. Lewallen was not precluded from testifying at his resentencing trial because he had not testified at the original trial. Rather, the trial court ruled against his request because his proffered testimony went to guilt or innocence and its mitigation value was not relevant to sentencing. The trial court denied Lewallen's request based upon the most basic rule of admissibility, i.e., the rule of relevancy. 12 O.S. 2011, § 2402. The trial court's ruling did not deny Lewallen the right to present a defense; it excluded the admission of irrelevant evidence. There was no structural error, no constitutional error, and no abuse of discretion by the trial court in excluding this evidence. Relief is not required.

Dkt. # 10-7, OCCA 2018 Op., at 5-7.

Because Rock requires a court to consider whether a defendant's constitutional right to testify should "bow to accommodate other legitimate interests in the criminal trial process," Rock, 483 U.S. at 55-56, the Court finds it helpful to discuss the state interests that the OCCA identified as worthy of accommodation.

### 1.      Resentencing, relevancy, Rojem and Malone

In determining that the trial court properly denied Lewallen's request to testify at the new sentencing proceeding, the OCCA cited the procedures for new sentencing proceedings established by OKLA. STAT. tit. 22, § 929(C)(1) and Oklahoma's general rule of relevancy, OKLA. STAT. tit. 12, § 2402, but ultimately agreed with the trial court that no part of Lewallen's proffered testimony was relevant to the jury's sentencing decision because that testimony either (1) "went to guilt or innocence" and thus was irrelevant and inadmissible under the reasoning of Rojem or (2) was

31

mitigating evidence and thus was irrelevant and inadmissible under the reasoning of Malone.  Dkt. # 10-7, OCCA 2018 Op., at 5-7; Dkt. # 11-3, Tr. Trial vol. 2, at 231-34 [482-85].[17]

Oklahoma law relating to sentencing in noncapital criminal cases provides important context for understanding the state interests identified by the OCCA.  Oklahoma is one of six states that permits sentencing by a jury in noncapital cases. Nancy J. King, How Different is Death? Jury Sentencing in Capital and Non-Capital Cases Compared, 2 OHIO ST. J. CRIM. L. 195, 195 n.1 (2004). Unlike the five other states with jury-sentencing schemes, Oklahoma "uses unitary jury proceedings for defendants with no prior convictions" and bifurcated jury proceedings when the state alleges that the defendant committed the crime charged after former conviction of one or more felonies.  Id.; OKLA. STAT. tit. 22, § 860.1.  The bifurcated jury proceeding protects the defendant's right to have a jury determine guilt or innocence without knowledge of the defendant's prior convictions.  Pickens v. State, 19 P.3d 866, 878 (Okla. Crim. App. 2001).

Oklahoma law also provides for the impaneling of a new jury in a noncapital case if, as in this case, a defendant's conviction is affirmed on direct appeal but his or her sentence must be vacated due to one or more errors that infected only the sentencing stage of the defendant's bifurcated jury trial.  OKLA. STAT. tit. 22, § 929.  And OKLA. STAT. tit. 22, § 929(C)(1) describes the scope of the new sentencing proceeding, providing that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding."  That same statute further provides that, "[a]dditional relevant

---

[17]    The trial court relied on reasoning from Roy II and Malone, but the OCCA relied on reasoning from Rojem and Malone.  As further discussed below, the OCCA's decision in Roy II, like the decision in this case, applied the reasoning from Rojem and Malone in the context of a noncapital sentencing proceeding.

evidence may be admitted including testimony of witnesses who testified at the previous trial." OKLA. STAT. tit. 22, § 929(C)(1).[18]  While the trial court mentioned that Lewallen waived his right to testify at the original trial, the OCCA did not read the plain language of this statute as barring a defendant from testifying at a new sentencing proceeding based on a prior waiver of that right.  See Dkt. # 10-7, OCCA 2018 Op., at 7 (stating that "Lewallen was not precluded from testifying at his resentencing trial because he had not testified  at the original trial").

Oklahoma law defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  OKLA. STAT. tit. 12, § 2401.  Further, under Oklahoma law, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Oklahoma, by statute or by [the Oklahoma Evidence Code].  Evidence which is not relevant is not admissible."  OKLA. STAT. tit. 12, § 2402; see also Stewart v. State, 372 P.3d 508, 512 (Okla. Crim. App. 2016) (recognizing "that relevant evidence is generally admissible").  Finally, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."  OKLA. STAT. tit. 12, § 2403.

The OCCA also relied on two prior decisions defining when evidence is relevant to sentencing or resentencing, Rojem and Malone.  In Rojem, a capital case, the defendant was

---

[18]    Notably, Oklahoma Senate Bill 25, which was engrossed to the House in February 2021, proposes several amendments to this statute, including the addition of language, in what is now OKLA. STAT. tit. 22, § 929(C)(1), expressly stating that "[t]he defendant may testify at his or her resentencing proceeding in accordance with the requirements of the Oklahoma Evidence Code." 2021 OK S.B. 25 (NS) (Feb. 21, 2021) (Westlaw).

conditionally granted federal habeas relief from his death sentence and was granted a new sentencing proceeding under OKLA. STAT. tit. 21, § 710.10a.[19]   Rojem, 130 P.3d at 290.   The new jury recommended a death sentence, and the defendant appealed.   Id.   One of the defendant's claims asserted that "the trial court erroneously precluded him from presenting evidence and argument or even mentioning any matters pertaining to 'residual doubt' as a mitigating circumstance, thereby frustrating his right to present a capital defense and violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7, 9, and 20 of Oklahoma's Constitution."   Rojem, 130 P.3d at 298.   The OCCA declined to decide whether the defendant in Rojem was denied the right to present a complete defense, because the OCCA had already determined that other errors required reversal for a new (third) sentencing proceeding.   Id.   However, to "give guidance for the benefit of the retrial procedure," the OCCA discussed whether the trial court should instruct the jury that it may consider residual doubt as a mitigating circumstance.   Id. Ultimately, the OCCA concluded that it "is improper for the issue of residual doubt to make its way into a capital resentencing proceeding to the extent [the defendant] argues here" because "evidence relating to residual doubt is 'not relevant to the defendant's character, record, or any circumstance of the offense,'" and, thus, no instruction should be given to advise the jury to consider residual doubt as a mitigating circumstance.   Rojem, 130 P.3d at 288-89 (quoting Bernay v. State, 989 P.2d 998, 1012 (Okla. Crim. App. 1999)).   In reaching this conclusion, the OCCA reasoned:

---

[19]   OKLA. STAT. tit. 21, § 710.10a(4), which applies to new sentencing proceedings in capital cases, provides, in relevant part, that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing; additional relevant evidence may be admitted including testimony of witnesses who testified at the previous trial."

[R]esentencing proceedings are unique, as the original jurors who personally listened to the first stage testimony and directly reviewed the evidence of guilt/innocence have been replaced with new jurors who are wholly unfamiliar with that evidence. Thus, any lingering doubts that existed are gone, for all intents and purposes.

Nevertheless, our capital resentencing statutes provide that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding." 21 O.S.2001, § 701.10a. To a certain extent, then, jurors are reintroduced to initial evidence and its strength.

And yet, resentencing jurors are initially instructed that the issue of guilt has already been decided and they are to accept that verdict and render a decision on sentence based on the law and evidence. It would be inconsistent and confusing to first tell jurors to accept the guilty verdict and then later specifically tell them to consider residual doubt as mitigation.

Rojem, 130 P.3d at 298. The OCCA further stated, "Of course, jurors in a resentencing proceeding will always be able to consider the weight of the evidence in deciding punishment. However, resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt. We will trust trial judges to use caution in exercising their discretion on this issue." Id. at 299.[20]

As previously noted, the trial court relied on Roy II, not Rojem, to exclude evidence it characterized as relating to guilt or innocence. Highly summarized, in Roy II, a noncapital case, the OCCA relied on Rojem's reasoning to affirm the trial court's exclusion of alibi evidence that had been presented at the defendant's original sentencing proceeding. Dkt. # 10-4, Roy II, at 19-22. The

---

[20]     Because the OCCA addressed the residual-doubt-instruction issue only to give guidance to the trial court on remand, the nature of the evidence the defendant in Rojem claimed was improperly excluded is unclear. Similarly, it is unclear whether the defendant in Rojem sought to testify on his own behalf or sought to introduce evidence through other witnesses. In a footnote, however, the OCCA stated that the defendant's claim that he was denied the right to present residual-doubt evidence "is somewhat exaggerated as the trial judge allowed the defense to put on evidence that male DNA found under the victim's fingernails did not match [the defendant]." Rojem, 130 P.3d at 299 n.16.

OCCA rejected the defendant's argument that the plain language of OKLA. STAT. tit. 22, § 929(C)(1) mandates the admission of all evidence that was presented at the original trial and reasoned that the alibi evidence that the defendant presented at the original sentencing proceeding was not relevant at the new sentencing proceeding because the defendant's conviction had been affirmed on appeal and his guilt was "not an issue at resentencing."  Dkt. # 10-4, Roy II, at 19-22.

In Lewallen's case, the OCCA appeared to craft and apply the following rule from Rojem: Because a new sentencing proceeding is not a chance to revisit guilt, a defendant may not introduce new evidence, i.e., evidence that was not presented at the original trial, if that evidence relates to guilt or innocence.  Dkt. # 10-7, OCCA 2018 Op., at 5-7.

The question presented to the OCCA in Malone was whether a defendant who was convicted in a noncapital case that was tried to a jury "was denied a fair sentencing proceeding when the trial court precluded the admission of mitigating evidence relevant to the jury's exercise of discretion." Malone, 58 P.3d at  209.  The OCCA answered that question in the negative, stating,

> Defendants in criminal trials deserve to have their day in court, to require the State to meet its burden of proof through evidence presented in open court, to tell their stories, and to defend themselves against the crimes of which they have been charged.  The Oklahoma Legislature defines how and when defendants accomplish those purposes.  In the instant case, Appellant was not denied a fair sentencing hearing by the trial judge's decision to preclude Appellant from presenting mitigating evidence to the jury at his non-capital sentencing proceeding.

Malone, 58 P.3d at 209.  To reach this conclusion, the OCCA reasoned,

> Oklahoma's criminal statutes allow non-capital defendants, at the time of formal sentencing, to explain to the trial judge "any legal cause" they have why judgment should not be pronounced against them.  22 O.S.2001, § 970.  But 22 O.S.2001, § 971 qualifies the phrase "any legal cause" by giving specific grounds for such a showing of cause, i.e., insanity and those grounds that would support a motion for new trial in 22 O.S.2001, § 952.  This appears to be a purely legal matter-except

where there is the discovery of new evidence-and the full extent of "allocution" provided under Oklahoma law, except as set forth below.

22 O.S.2001, § 973 allows "either party" at the sentencing stage to raise "circumstances which may be properly taken into view, either in aggravation or mitigation of punishment," but only in those cases where the issue of punishment has been left to the judge.  In all other cases, i.e., when the defendant has demanded the jury to assess punishment or the trial judge has allowed the jury to assess punishment, there simply is no provision allowing for mitigating evidence to be presented in the sentencing stage of the trial. This is a limitation enacted by our Legislature, and the limitation is undoubtedly constitutional.

Certain evidence that may be in fact "mitigating" or "aggravating" will inevitably be introduced throughout any trial, although that evidence is admitted to prove the elements of the crime, to support a legal defense, or to impeach a witness. A criminal defendant's story will in fact be told, by the witnesses he or she chooses and through his or her own testimony.  But a criminal trial is not to be based upon so-called "character" evidence, and the same principle applies to sentencing proceedings.

Malone, 58 P.3d at 209-10.[21]

**2.      The state's interests v. limitations on Lewallen's right to testify**

Preliminarily, the Court agrees with the OCCA's characterization of Lewallen's proffered testimony as including some mitigating evidence and some evidence relating to guilt or innocence. Further, the Court agrees with the OCCA's apparent acknowledgment that at least some of the proffered testimony—namely, Lewallen's proposed testimony regarding "evidence of [his] medical condition and his consumption of prescribed medication as well as its effect on his ability to clean his house and care for his children"—was relevant to the jury's sentencing decision and had been introduced at the original trial and at the new sentencing through the state's witnesses.  Dkt. # 10-7,

---

[21]      The OCCA did not further describe the "so-called 'character' evidence" that the defendant in Malone wanted to introduce at the sentencing stage of his jury trial.  Nor does the decision indicate whether the defendant in Malone sought to present that evidence through his own testimony or through other witnesses.

OCCA 2018 Op., at 6. Based on this understanding of the substance of Lewallen's proffered testimony, careful consideration of the state's asserted interests in applying the procedures and evidentiary rules just discussed, and the guidance that Rock provides, the Court finds, for several reasons, (1) that the OCCA's decision either is contrary to or involves an unreasonable application of Rock and, for those same reasons, (2) that the trial court's ruling impermissibly infringed on Lewallen's constitutional right to testify.

### a. Mitigating evidence

To the extent that the OCCA concluded that some of Lewallen's proffered testimony was mitigating evidence and thus properly was excluded under Malone, the OCCA ignored that Rock expressed special criticism for per se exclusionary rules. Like the Arkansas rule barring the admission of a defendant's hypnotically-refreshed testimony, Malone's rule barring any defendant from presenting mitigating evidence at the sentencing phase of a noncapital jury trial does "not allow a trial court to consider whether [mitigating evidence] may be admissible in a particular case." Rock, 483 U.S. at 56, 61. And, by applying Malone's per se exclusionary rule to bar Lewallen's request to testify, the OCCA also ignored Rock's discussion regarding the distinction between applying per se exclusionary rules to exclude certain kinds of evidence introduced through the testimony of a nondefendant witness and applying that same rule to exclude the same kind of evidence introduced through the testimony of a defendant who has a constitutionally-protected right to testify. Rock, 483 U.S. at 57-58 & n.15. Under Rock's reasoning, the trial court's application of Malone's per se rule to exclude Lewallen's proffered testimony, without any consideration of whether some or all of the

38

mitigating evidence might be admissible in this particular case, was an arbitrary restriction on Lewallen's right to testify.[22]

Further, it is not clear from Malone that the state has a legitimate interest in prohibiting a noncapital defendant from presenting mitigating evidence to the jury when the state (1) provides a noncapital defendant the statutory right to have a jury affix punishment and (2) permits a noncapital defendant who waives the statutory right to jury sentencing to present mitigating evidence to a judge. But even assuming the state has a legitimate interest in barring noncapital defendants from presenting mitigating evidence to a jury, applying the Malone rule here was disproportionate to the purpose the Malone rule appears to serve. Undoubtedly, some of Lewallen's proffered testimony was traditional mitigating evidence (evidence of his age, pre-existing medical conditions, past work injury, etc.) but some simply sought to explain the circumstances of the offense with the hope of a

---

[22]      As Justice O'Connor explained in a concurring opinion in Gilmore v. Taylor, 508 U.S. 333, 349 (1993), the Supreme Court has

not held that the Eighth Amendment's requirement that the jury be allowed to consider and give effect to all relevant mitigating evidence in capital cases . . . applies to noncapital cases. Nevertheless, we have held that other constitutional amendments create "constitutionally relevant evidence" that the jury must be able to consider. See, e.g., Rock v. Arkansas, 483 U.S. 44, 51 (1987) ("The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution"); Delaware v. Van Arsdall, 475 U.S. 673, 678-679 (1986) (Rehnquist, J.) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination" (internal quotation marks omitted)). The category of "constitutionally relevant evidence" is not limited to capital cases.

Significantly, the question in this case is not whether the state must permit a noncapital defendant to present mitigating evidence to a jury. Rather, the question is whether, under the facts of this case, the exclusion of mitigating evidence under Malone's per se rule impermissibly infringed on Lewallen's constitutional right to testify. Justice O'Connor's statement suggests Lewallen's mitigation evidence may have been "constitutionally relevant," and thus admissible, even if not relevant under state law.

mitigating effect (evidence of recent back injury, inability to clean house, recent acquisition of dog crate, etc.).  However, Lewallen ultimately sought permission to present both  kinds of mitigating evidence only in his own words, not to introduce expert witnesses or several family members to persuade the jury to impose a lower sentence.  Under the particular circumstances of this case, Lewallen's constitutional right to testify should not have been forced to accommodate the state's asserted interest in barring the presentation of mitigating evidence in all noncapital cases.

### b.        Evidence of guilt or innocence

To the extent that the OCCA concluded that some of Lewallen's proffered testimony was not relevant because it "went to guilt or innocence" and thus properly was excluded under Rojem or the "rule of relevancy," that conclusion was objectively reasonable, but only in part.  The state unquestionably has a legitimate interest in excluding evidence that is not relevant.  See, e.g., Scheffer, 523 U.S. at 308 (noting that state rulemakers "have broad latitude under the Constitution to establish rules excluding evidence from trials"); Rock, 483 U.S. at 55 (recognizing that "the right to present relevant testimony is not without limitation").  And the only apparent restriction imposed on Lewallen's right to testify by the plain language of OKLA. STAT. tit. 22, § 929(C)(1) and Oklahoma's rules of evidence relating to relevancy was that his proffered testimony had to be relevant to be admissible.  General rules or procedures permitting the exclusion of evidence that is not relevant do not offend the Constitution.

However, as described by the OCCA in this case, Rojem provides a more specific relevancy rule:  it bars a defendant from presenting new evidence of "guilt or innocence" at a new sentencing proceeding when the defendant's conviction has been affirmed on appeal because that evidence is not relevant as guilt is not an issue at the new sentencing proceeding. Dkt. # 10-7, OCCA 2018 Op.,

40

at 5-6.  The state has a legitimate interest in barring the admission of new innocence-related evidence at a new sentencing proceeding when the defendant's conviction has been affirmed on appeal.  <u>See</u> <u>Oregon v. Guzek</u>, 546 U.S. 517, 523 (2006) (considering "whether the State may limit the innocence-related evidence [a capital defendant] can introduce at [a new] sentencing proceeding to the evidence [the defendant] introduced at his original trial," and concluding that "nothing in the Eighth or Fourteenth Amendments that provides a capital defendant a right to introduce new [alibi] evidence . . . at sentencing").  In <u>Guzek</u>, the defendant was granted a new (third) sentencing proceeding after sentencing-phase errors twice resulted in decisions from the Oregon Supreme Court vacating the defendant's death sentences.  <u>Guzek</u>, 546 U.S. at 519.  To provide guidance for resentencing, the Oregon Supreme Court "addressed the admissibility of certain evidence [the defendant sought] to introduce in that proceeding, including live testimony from his mother about his alibi."  <u>Id.</u> at 520.  The defendant's mother testified at the original trial, but the defendant wanted to present her testimony as to "*new* evidence that shows he was not present at the scene of the crime."  <u>Id.</u> at 523 (emphasis in original).  The Oregon Supreme Court held that the Eighth and Fourteenth Amendments provided the defendant "a federal constitutional right to introduce this evidence at his upcoming sentencing proceeding."  <u>Guzek</u>, 546 U.S. at 520.

Oregon sought review, and the Supreme Court disagreed with the Oregon Supreme Court's holding.  The <u>Guzek</u> Court reasoned, in part, that new alibi evidence "is *inconsistent* with [the defendant's] prior conviction," as it "sheds no light on *the manner* in which he committed the crime for which he was convicted."  <u>Guzek</u>, 546 U.S. at 523 (emphases in original).  The <u>Guzek</u> Court further reasoned, in part, "that sentencing traditionally concerns *how*, not *whether*, a defendant committed the crime," whereas, "alibi evidence—concerns only *whether*, not *how*, he did so."

41

Guzek, 546 U.S. at 526 (emphases in original).  The Guzek Court also noted that the "parties previously litigated the issue to which the evidence is relevant—whether the defendant committed the basic crime" and the new alibi evidence "thereby attacks a previously determined matter in a proceeding at which, in principle, that matter is not at issue."  Id.  Finally, the Guzek Court noted that, under Oregon's statute governing new sentencing proceedings in capital cases, the defendant was free to present any alibi evidence that he presented at the original trial.[23]  Id. at 523.

In light of Guzek, the Rojem rule seems constitutionally sound.  And it may have been objectively reasonable for the OCCA to conclude that the trial court properly excluded a few portions of Lewallen's proffered testimony under this rule without violating his right to testify.  For example, Lewallen wanted to testify that he did not lock W.L. outside, that he did not lock C.L. in a dog cage, that he changed the children's diapers throughout the day, and that he attempted to clean the house despite his recent back injury.  Because some or all of this particular testimony could be considered evidence attacking his conviction for child neglect, the trial court's application of the Rojem rule to exclude these portions of Lewallen's proffered testimony appears consistent with Guzek's reasoning.  But the objective reasonableness of the OCCA's decision on this point presents a close question because this case is factually distinguishable from Guzek in two significant ways.  The defendant in Guzek wanted to introduce new alibi evidence and he wanted to introduce that evidence through his mother's testimony.  The Guzek Court simply did not address the question of whether excluding

---

[23]  Oregon's statute governing new sentencing proceedings in capital cases, like Oklahoma's statute that applies to resentencing hearings in capital cases, provides that "[a] transcript of all testimony and all exhibits and other evidence properly admitted in the prior trial and sentencing proceeding are admissible in the new sentencing proceeding. Either party may recall any witness who testified at the prior trial or sentencing proceeding and may present additional relevant evidence."  ORE. REV. STAT. § 138.052(b)(5).

the seemingly broader category of new evidence that "went to guilt or innocence" at a new sentencing proceeding when that evidence is introduced through the defendant's testimony would result in a constitutional violation.  Thus, while Guzek informs the analysis regarding the legitimacy of some applications of the Rojem rule, it does not speak to the situation here when the defendant's right to testify is at stake.  In any event, even if a small portion of Lewallen's proffered testimony that directly attacked his conviction was properly excluded under the reasoning of Rojem, the exclusion of the remainder of his testimony relating to guilt or innocence was not similarly justified.

Like the defendant in Rock, Lewallen sought to testify, at least in part, about facts that described the events that occurred on the days immediately leading up to and the day of his arrest for child neglect, the offense for which he was convicted.  Though is it not clear from the trial court's ruling or the OCCA's decision whether this testimony was excluded under the Malone rule or the Rojem rule, or the two rules in tandem, by applying Rojem to a broader category of evidence than the alibi evidence at issue in Guzek, i.e., all of Lewallen's proffered testimony that purportedly "went to guilt or innocence," the trial court excluded at least some evidence that was relevant to the new jury's sentencing decision, specifically, Lewallen's proffered testimony that "concern[ed] *how*, not *whether*, [he] committed the crime."  Guzek, 546 U.S. at 526.

As a result, the trial court's application of Rojem to exclude Lewallen's proffered testimony that focused on the circumstances of his offense rather than attacked his conviction placed arbitrary and disproportionate restrictions on his right to testify.  The restriction was arbitrary to the extent the trial court excluded evidence that had previously been admitted at the new sentencing proceeding, through the state's witnesses, as relevant to the jury's sentencing determination because the trial court (and the OCCA) deemed that same evidence not relevant to sentencing when Lewallen sought

43

to introduce it through his own testimony.  See Fieldman, 969 F.3d at 807 (noting that "[a]rbitrariness 'might be shown by a lack of parity between the prosecution and the defense; the state cannot regard evidence as reliable enough for the prosecution but not for the defense'" (quoting Kubsch v. Neal, 838 F.3d 845, 858 (7th Cir. 2016))).  The restriction was disproportionate to the extent the trial court excluded evidence that merely described the events that occurred in the few days before, and the day of, Lewallen's arrest and that did not deny the occurrence of those events or otherwise attempt to undermine the original jury's guilty verdict.

As previously discussed, when it affirmed the trial court's ruling, the OCCA acknowledged that at least some of Lewallen's proffered testimony—namely, his testimony regarding "evidence of [his] medical condition and his consumption of prescribed medication as well as its effect on his ability to clean his house and care for his children"—was relevant to the jury's sentencing decision and had been introduced at the original trial and at the new sentencing through the state's witnesses. Dkt. # 10-7, OCCA 2018 Op., at 6.  And, by affirming the exclusion of this evidence under Rojem, the OCCA not only overlooked the similarities between this case and Rock, but also disregarded Rock's reasoning that the application of a state's evidentiary rule may "ha[ve] a significant adverse effect on [the defendant's] ability to testify" if it "virtually prevent[s] her from describing any of the events that occurred on the day of [her offense], despite corroboration of many of those events by other witnesses." Rock, 483 U.S. at 57.

Ultimately, like the defendant in Rock who was barred from "describ[ing] the actual [crime] except in the words contained in [her doctor's] notes," Rock, 483 U.S. at 57, Lewallen was barred from describing the circumstances of his offense, except in the words of Detective Hodges, who testified about Lewallen's post-arrest statements, and in the words of W.L., who gave an abbreviated

account of the day's events from the perspective of a three-year-old.  Under these circumstances, the state's interest in excluding evidence that "went to guilt or innocence" was not sufficient to override Lewallen's constitutional right to testify.

### 3.    Wholesale exclusion

Lastly, the Court notes that this case differs from Rock in two ways.  First, the defendant in that case was permitted to testify, subject to the per se exclusionary rule barring her hypnotically-refreshed testimony, whereas Lewallen was not permitted to testify at all.  Yet, even in Rock, the Supreme Court cautioned that "[w]holesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State" that the evidence subject to the exclusionary rule "is always so untrustworthy and so immune to the traditional means of evaluating credibility that it would disable a defendant from presenting her version of the events for which she is on trial."  Rock, 483 U.S. at 61.  Here, as Crow contends, Lewallen would have been subject to cross-examination had he been permitted to testify about his version of the events that resulted in his conviction.  See Dkt. # 10, Resp., at 17 (noting that if Lewallen testified "the prosecutor would have subjected [him] to a thorough cross-examination regarding the state of his children, the condition of his house, and his decision to mix beer with Oxycodone while he was the sole caregiver of three children under the age of four").  Neither the trial court nor the OCCA seemed to contemplate the possibility of permitting Lewallen to exercise his right to testify, subject to specific objections and subject to cross-examination.  By affirming the wholesale exclusion of Lewallen's proffered testimony on the basis that no portion of that testimony was relevant or admissible in light of Rojem and Malone, the OCCA disregarded Rock's guidance on this point.

Second, the defendant in <u>Rock</u> was limited in her presentation of testimony regarding her guilt, whereas Lewallen was wholly barred in his presentation of testimony regarding his punishment. But the Court finds that this is a distinction without a difference. The OCCA vacated Lewallen's sentence on his first appeal and remanded his case for resentencing. The new sentencing proceeding was therefore a critical part of Lewallen's criminal trial even though his guilt had been determined by the original jury and his conviction had been affirmed by the OCCA. Further, as previously discussed, neither the OCCA nor Crow, on behalf of the state, suggests that Lewallen had no right to testify at the new sentencing proceeding based on his waiver of that right at the original trial. Rather, both state courts simply concluded, and Crow appears to argue, that Lewallen had nothing to say that was relevant to the jury's exercise of its sentencing discretion.

These distinctions between the instant case and <u>Rock</u> are not strong enough to save the OCCA's decision from being contrary to or involving an unreasonable application of <u>Rock</u>. Even the OCCA's conclusion that "[t]he trial court's ruling did not deny Lewallen the right to present a defense," Dkt. # 10-7, OCCA 2018 Op., at 7, a right that encompasses but differs from his more specific right to testify, demonstrates that the OCCA failed to "perform the constitutional analysis that is necessary when a defendant's right to testify is at stake." <u>Rock</u>, 483 U.S. at 58.

### 4.      Conclusion

In sum, <u>Rock</u> recognized that "[n]umerous state procedural and evidentiary rules control the presentation of evidence and do not offend the defendant's right to testify." <u>Rock</u>, 483 U.S. at 55 n. 11. But it held that evidentiary rules that place "restrictions a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." <u>Id.</u> at 55-56. Based on the foregoing analysis, the Court concludes that the OCCA's adjudication of Lewallen's

constitutional claim that he was denied his right to testify resulted in a decision that either was contrary to or  involved an unreasonable application of <u>Rock</u>.  As a result, § 2254(d) does not bar Lewallen's request for federal habeas relief.  The Court further concludes that state's evidentiary rules at play in this case imposed arbitrary and disproportionate restrictions on Lewallen's constitutional right to testify and that the state's asserted interests in applying those evidentiary rules did not justify the complete denial of that right.  The only question that remains is whether the constitutional error was harmless.[24]

**IV.     The violation of Lewallen's right to testify was not harmless under <u>Brecht</u>.**

Crow contends that the constitutional error in this case was harmless under <u>Brecht</u> because "it did not negatively impact the sentence imposed."  Dkt. # 10, Resp., at 16-17 & n.5.  The Court disagrees.  <u>Brecht</u> requires this Court to consider, in light of the record as a whole, whether the constitutional error had "an injurious effect or influence in determining the jury's verdict.'"  <u>Brecht</u>, 507 U.S. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

The verdict at issue here is the jury's verdict that the circumstances of this case and the fact that Lewallen had seven prior felony convictions warranted a 14-year prison sentence.  Having carefully reviewed the record as a whole, including the full transcripts of the new sentencing proceeding, the Court is at least in "grave doubt" that the jury's verdict was not substantially

---

[24]     As he did in state court, Lewallen maintains that the violation of his right to testify resulted in a structural error and, thus, is an error that is not subject to harmless-error review.  Dkt. # 1, Pet., at 5, 7.  But, on this point, the Court agrees with the OCCA's determination that the Supreme Court has not identified the denial of a defendant's right to testify as one of the few constitutional errors that is not amenable to the harmless-error analysis.  Dkt. # 10-7, OCCA 2018 Op., at 2-3; <u>see</u> Arizona v. Fulminante, 499 U.S. 279, 306-08 (1991) (gathering cases involving "trial errors" that are subject to harmless-error review); <u>id.</u> at 310 (gathering cases involving "structural defects" that defy harmless-error review).

attributable to the exclusion of Lewallen's proffered testimony and the resulting denial of his constitutional right to testify.

As previously discussed, see supra  background section III, at 4-14, the facts supporting Lewallen's conviction demonstrated that Lewallen took prescription medication, drank some beer, and fell into a deep slumber while he was charged with the care of his three children, all of whom were under the age of four.  The facts further demonstrated that while Lewallen slept, one child was found naked and locked outside in the cold, one was found naked and asleep next to Lewallen in the family's unkempt house, and the third was found inside the house sitting in a dirty diaper in a locked dog cage.  The Lewallen children were clearly unsupervised but just as clearly unharmed.  Defense counsel observed that at least two of the state's witnesses-—Captain Tipler and Matthew Testerman—gave "emotional" testimony at the new sentencing proceeding, in 2017, about the conditions in which they found the Lewallen children five years earlier, in 2012.  Dkt. # 11-4, Tr. Trial vol. 3, at 31 [520].  Testerman, the neighbor who found W.L. outside in the cold, even cried during his testimony.  Dkt. # 11-4, Tr. Trial vol. 3, at 31 [520].  Lewallen's ability to counter this powerful testimony from witnesses who were total strangers to the Lewallen children before the day of Lewallen's arrest was severely limited, and his ability to counter it with personal testimony about the day of his arrest was nonexistent.  Lewallen was permitted to provide his version of the facts only through the testimony of Detective Hodges, who gave a secondhand account of Lewallen's statements about the circumstances that resulted in his conviction and through the videotaped words of his then three-year-old son, W.L.

On the record presented, the Court "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jury's verdict] was not

substantially swayed by the error." <u>Kotteakos</u>, 328 U.S. at 765. Because it is therefore "impossible to conclude that substantial rights were not affected," <u>id.</u>, the Court conclude that the error was not harmless.

### *CONCLUSION*

Because the facts and the law support Lewallen's claim that he is in custody under a sentence that was imposed by a state court in violation of the Constitution, the Court concludes that the petition for writ of habeas corpus shall be conditionally granted. No later than 90 days after the entry of this opinion and order, respondent Scott Crow shall release petitioner William Todd Lewallen (ODOC # 199083) from state custody unless, before the end of that 90-day period, the state (1) has vacated Lewallen's sentence and (2) has either (a) imposed a new sentence after conducting a new sentencing proceeding wherein Lewallen was permitted to testify, or (b) imposed a new sentence, pursuant to a negotiated sentencing agreement approved by the trial court. This conditional grant of relief does not preclude the state from agreeing to a new sentence that would permit Lewallen's immediate release to begin serving an appropriate period of post-release supervision.

Crow shall file a notice of compliance no later than 21 days after the state has complied with the conditional grant of relief. In addition, Crow shall file a status report no later than 30 days after the entry of this opinion and order, and every 30 days thereafter, until the 90-day period expires or the state complies with the conditional grant of relief, whichever occurs first.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Clerk of Court shall note on the record the substitution of Scott Crow in place of Joe Allbaugh as party respondent.

2. The petition for writ of habeas corpus (Dkt. # 1) is **conditionally granted**.

3.    No later than 90 days after the entry of this opinion and order, respondent Scott Crow shall release William Todd Lewallen (ODOC # 199083) from state custody unless, before the end of the 90-day period, the state (1) has vacated Lewallen's sentence and (2) has either (a) imposed a new sentence after conducting a new sentencing proceeding wherein Lewallen was permitted to testify, or (b) imposed a new sentence, pursuant to a negotiated sentencing agreement approved by the trial court.

4.    This conditional grant of relief does not preclude the state from agreeing to a new sentence that would permit Lewallen's immediate release to begin serving an appropriate period of post-release supervision.

5.    Crow shall file a status report no later than 30 days after the entry of this opinion and order, and every 30 days thereafter, until the 90-day period expires or the state complies with the conditional grant of relief, whichever occurs first.

6.    Crow shall file a notice of compliance not later than 21 days after state has complied with the conditional grant of relief.

7.    A separate judgment shall be entered in this matter.

       **DATED** this 11th day of August, 2021.

                                                  _____
                                                  CLAIRE V. EAGAN
                                                  UNITED STATES DISTRICT JUDGE